93 So.2d 271 (1957)
Collin CALCOTE
v.
CENTURY INDEMNITY COMPANY et al.
No. 4340.
Court of Appeal of Louisiana, First Circuit.
February 4, 1957.
Rehearing Denied March 25, 1957.
*273 Gist, Murchinson & Gist, Alexandria, Kay & Kay, De Ridder, for appellant.
Wood & Jackson, Leesville, for appellees.
LOTTINGER, Judge.
This is a workmen's compensation proceeding wherein the plaintiff seeks to recover benefits for total permanent disability. It is alleged that on or about the 22nd day of March, 1955, plaintiff was in the employ of Conroe Creosoting Company and Garney McMullin as a laborer, cutting and felling logs in the hazardous employment of these defendants, logging and lumbering, and while in the course of and scope of that employment, and performing services incidental thereto, he suffered accidental injuries to his left leg and knee, totally and permanently disabling him from doing work of any reasonable character. The further allegation is made that in furtherance of its trade and business, Conroe Creosoting Company engaged and contracted with Garney McMullin to log and fell piling, and to haul and deliver the same in trucks. In addition to making Conroe and McMullin parties defendant, the plaintiff also joined the other defendant, Century Indemnity Company, alleging it to be the compensation insurance carrier of Conroe.
The latter first filed an exception to jurisdiction, ratione personae, which was tried and overruled with written reasons assigned.
The defendant Century Indemnity Company filed exceptions of no cause and no right of action. The former was overruled and the latter referred to the merits.
Each of the three defendants filed a separate answer. That of McMullin is in the nature of a general denial, except that he admitted the plaintiff's employment and rate of pay and the type of business in which he was engaged. The answer of Conroe denies, generally, the allegations of the petition. It sets up the defense that it is a Texas corporation, not engaged in business in Louisiana and that McMullin was not its independent contractor, but rather that the relationship of buyer and seller existed between them. It is specifically denied that the policy of insurance with Century covered operations anywhere other than in the State of Texas. Century's answer is also in the form of a general denial and specifically pleads that it is not liable, its policy as written covering only Conroe's operations in Texas.
At the close of taking testimony, Conroe and Century filed a joint exception of no right of action based on the premise that the pleadings and evidence failed to disclose same as to these defendants. This exception was referred to the merits.
Following trial on the merits in the Court below judgment was rendered sustaining the exception of no right of action filed by Century Indemnity Company and rejecting the plaintiff's demands as to it. The exception of no right of action filed by Conroe Creosoting Company was overruled and judgment rendered against it and Garney McMullin in solido as prayed for (less a credit of four weekly installments). The judgment as rendered against Conroe was in turn rendered in its favor and against McMullin, and the matter is now before us on appeals taken by both. An appeal was also taken by the plaintiff as to that part of the judgment rendered in favor of the Century Indemnity Company.
In this Court the plaintiff has filed a motion to dismiss the appeal taken by Conroe on the following grounds:

*274 "1
"That judgment on the merits of this cause was signed in the District Court on February 10, 1956, in favor of Plaintiff, Collin Calcote, and against Defendant, Conroe Creosoting Company.

"2
"That an order of suspensive appeal was granted Conroe Creosoting Company, Defendant and Appellant herein, returnable to the Honorable Court of Appeal, First Circuit, State of Louisiana, on or before April 9, 1956; the bond for the suspensive appeal being fixed in the sum provided by law.

"3
"That a suspensive appeal bond for Conroe Creosoting Company was filed on February 17, 1956.

"4
"That the transcript in this cause was not filed in this Honorable Court of Appeal by the return date of April 9, 1956, or within three (3) days thereafter; and that no extension of time for the filing of said transcript was ever obtained.

"5
"That the appeal, sought to be taken by Conroe Creosoting Company herein, is conclusively presumed to be abandoned, and must be dismissed."
Conroe's answer to the above is as follows:

"1
"That the allegations of fact contained in paragraph 1 of the plaintiff-appellee's motion are admitted.

"2
"That the allegations of fact contained in paragraph 2 of the plaintiff-appellee's motion are admitted.

"3
"That the allegations of fact contained in paragraph 3 of the plaintiff-appellee's motion are admitted.

"4
"That except as hereinafter modified and explained the allegations of fact contained in paragraph 4 of the plaintiff-appellee's motion are denied.

"5
"That the allegations of fact contained in paragraph 5 of the plaintiff-appellee's motion are denied.
"Further answer the motion of the plaintiff-appellee the defendant-appellant with respect shows:

"6
"That after the orders of appeal were granted herein and the bond filed as set forth in the plaintiff's motion the attorney for the defendant-appellant, Conroe Creosoting Company, wrote to the Clerk of Court of the Thirtieth Judicial District Court on March 14, 1956, and again on March 16, 1956, calling his attention to this appeal and requesting certain information of him regarding the return date and costs in connection with the said appeal; that copies of the said letters to Mr. Jack Hadnot, Clerk of Court, are annexed hereto and made a part hereof by reference.

"7
"That the Clerk of Court of the Thirtieth Judicial District Court did not answer either of the letters written by the attorney for defendant-appellant but on the other hand by way of a statement dated March 22, 1956, sent to the attorney for the defendant-appellant his bill for $8.00 covering the costs of preparing the Court of Appeal record and the filing fee in the Court of Appeal; that the said bill is annexed hereto and made a part hereof by reference.

"8
"That by check dated March 26, 1956 the attorney for the defendant-appellant paid the amount of the statement received from the Clerk of Court to the Clerk of Court of the Thirtieth Judicial District and the same was deposited by him on March 31, *275 1956; that a photostatic copy of the said check both back and front is annexed hereto and made a part hereof.

"9
"That the defendant-appellant was never at any time notified by the Clerk of Court that an extension of time would be required in order to prepare and file the transcript in this case but on the other hand the first notice which the defendant-appellant had of the delay in filing the matter was on or about May 2, 1956 when the attorney for the defendant-appellant received a letter from the Clerk of the Court of Appeal for the first circuit stating that the matter was received and filed for appeal on the date of April 16, 1956; that the said information by the Clerk of Court of Appeal was obtained after the attorney for the defendant-appellant wrote the said Clerk of Court on or about April 26, 1956, requesting information as to when the appeal was filed.

"10
"That since the failure to timely file the appeal was due in no manner to the negligence or lack of action or fault of the defendant-appellant in this case but on the other hand was due to the fault, negligence or dereliction of duty of the Clerk of Court of the Thirtieth Judicial District, an automatic extension of time for the filing of the appeal was obtained by the defendant-appellant without the necessity of any motion therefor.

"11
"That the appeal by Conroe Creosoting Company in this case was timely filed in accordance with the laws of the State of Louisiana and therefore plaintiff's motion should be dismissed.
"Wherefore, defendant-appellant prays that after due hearing hereof the motion to dismiss the appeal be rejected at plaintiff-appellee's costs."
From the above and foregoing it is apparent that failure to timely lodge the appeal was due, not to the fault of the appellant, but rather the Clerk of the District Court, and, that being the case, we follow the rule laid down by us in Succession of Bickham, La.App., 197 So. 924, 925, which is as follows:
"Where the appellant secures an order of appeal, files his bond and deposits the necessary filing fee for the appeal with the clerk of the district court from which the appeal is taken, it then becomes the duty of the clerk of the district court to transmit the original record in the case, together with a part of the filing fee, to the clerk of court of appeal, and in the absence of some showing to the effect that a failure to file the transcript in time is due to some fault on the part of the appellant or his attorney, the appeal will not be dismissed for a failure of the clerk of the district court to file the transcript on or before the return day of the appeal.
"As there is nothing to show that the failure to file the transcript on the return date in this case was due to any fault of the appellant or his attorney, in accordance with the above rule, we must and do hereby overrule the motion to dismiss the appeal in this case."
The above rule has been consistently applied by us and was used as late as November 18, 1954, in the case of "Hotel Donaldson Co., Inc., v. Anderson Hotels of Louisiana, Inc., La.App., 75 So.2d 884.
We consider the question of liability of each defendant separately. The trial judge rendered written reasons for judgment, and, with respect to the liability of McMullin, made the following observations and conclusions:
"Plaintiff testified, without contradiction, that he is 45 years old, with an 8th grade education, and all of his adult life he has been a common laborer, mostly in the logging business. On March 22, 1955, and for sometime prior thereto, he had been employed by McMullin, cutting and hauling piling and poles (logs) at an average daily *276 rate of pay in excess of $8.00 per day; that on the date mentioned, while engaged in his employment, he accidentally slipped his foot under a limb and sprained his knee. He immediately told his co-worker of the occurrence and on the same day notified his direct employer, McMullin. He continued work for seven days, when the pain became so intense he had to quit, and, acting on the instructions of McMullin, went to see Dr. Strecker at DeRidder, Louisiana. Dr. Strecker, after examining and treating him, sent him to see Dr. Hatchette at Lake Charles. Neither Dr. Strecker nor Dr. Hatchette testified in the case. Plaintiff further testified that he has been unable to work since he quit seven days after the accident and was sent to see Dr. Strecker.
"Dr. Reid of DeRidder testified, in plaintiff's behalf, that he saw plaintiff on September 22, 1955, at which time he found a condition that could be the result of the tearing of the muscle or split in the sheath covering the muscle back of the knee, resulting in constant pain and producing a totally disabling condition that would grow constantly worse, unless relieved by surgical operation. No operation was shown to have been offered.
"The defendant, McMullin, was responsible for plaintiff going to see Dr. Strecker, who sent him to see Dr. Hatchette. Since the testimony of these doctors was not produced by defendant and the record is silent as to any reason for failure to produce it, the Court must assume that they would both have testified as did Dr. Reid. In view of Dr. Reid's and plaintiff's uncontradicted testimony, it must be held that plaintiff is totally permanently disabled at this time.
"There was no contradiction of plaintiff's testimony as to the happening of the accident and only defendant Conroe, in brief, seems to seriously contend that the evidence is insufficient to justify a holding that one did happen. The Court is of the opinion that such contention is without merit. Plaintiff, prior to the date he says he was injured, so far as there is proof or even intimation in the record, was not suffering from the disabling condition Dr. Reid found and which was consistent with the happening as related by plaintiff. It often happens, because of the nature of the work of logging, there is no one present to see an accident to an employee, other than the employee, himself, but the cases are many where the happening of the accident is considered proved by the testimony of the injured employee, plus the circumstance that he had a disabling condition after the time he says he was injured, that he did not have before.
"Defendant, McMullin, seemed to contend, and tried to develop that fact by cross examination of plaintiff, that plaintiff did not intend to sue him, McMullin. The Court gathered that McMullin and plaintiff are good friends and plaintiff appeared to be reluctant to admit, in McMullin's presence, that he wanted a judgment against McMullin. However, under questioning by the Court, he finally admitted that he knew he was suing McMullin and did want a judgment against him.
"Insofar as the liability of McMullin is concerned, it cannot be doubted. In fact, no serious effort was made to dispute it."
The defenses of Conroe appear to be as follows: (a) Lack of jurisdiction rationae personae, (b) that the relationship between it and McMullin was that of buyer and seller rather than principal and independent contractor, and (c) that its operations in Louisiana were not hazardous within the meaning of the compensation statute. These were disposed of by the trial judge as follows:
"Conroe operates a creosoting plant at Conroe, Texas. According to the testimony of its agent or employee, Vaughn, it does not, itself, cut the timber and haul it to its plant, but buys those products, either delivered at its plant, or loaded on railroad cars. Vaughn was sent by his employer, *277 in Conroe's automobile to Louisiana, for the purpose of buying peeled piling and poles which would be shipped by rail to its plant at Conroe, Texas, where the process of manufacturing would be completed by `treating' them, that is, creosoting those products. Mr. Vaughn contracted Mr. Jack Anderson, a representative of Anderson-Post Hardwood Lumber Company, and made arrangements to buy from that Company about $24,000.00 worth of timber, paying $1,000.00 cash, to Anderson, at the time the deal was made with him, and thereafter, from time to time, paying sufficient amounts to always keep the timber to be cut paid for in advance of its being cut, each tree, as it was cut, being the property of Conroe. There was first only one person engaged by Vaughn to fell, peel and haul the piling, namely, a Mr. West. After West had worked on the timber for sometime, Anderson suggested to Vaughn that McMullin was a good operator and asked Vaughn to let him cut some of the timber to which Vaughn agreed and told Anderson to tell McMullin to go to work, which he did. Vaughn was on the ground practically every day and helped Anderson mark the trees that were to be cut. According to Anderson the trees remained the property of Anderson-Post Company until cut, whereupon they became the property of Conroe, they having been paid for in advance by Conroe.
"Vaughn (Tr. 62) admitted paying the $1,000.00 in advance to Anderson, and thereafter continued to make such advance payments. It should here be borne in mind that at least the $1,000.00 was paid before either West or McMullin had been engaged to cut and haul the timber. He said `I would advance him before the timber was cut.' (Tr. 62.) At page 63: Q. `* * * the purpose of your advancing the money to Mr. Anderson, was to acquire this piling timber he had?' A. `That's right.' A. `That was the base for the stumpage.' Q. `Of course, that was all you bought from Mr. Anderson, wasn't it?' A. `Yes, sir.' (Emphasis added.) (Tr. 63.) At the same page the witness admitted that when a tree was cut down, its value was deducted from the amount Vaughn had made in advance. At 65, under questioning by the Court, and after a page of testimony evading Counsel's questions as to whom the tree belonged when it was cut down, he finally admitted that he `supposed' it belonged to Conroe and at the bottom of that page said, `Well, I figure it would be my tree,' meaning as soon as it was cut down. Again, at page 67 he testified, after repeated attempts to evade direct answers to questions as follows: Q. `So the amount of money you paid Garney McMullin for cutting the trees down, for peeling the trees, and for hauling them to the railroad line, actually was the amount of labor that Garney McMullin had in the job wasn't it?' A. `I suppose so.' At pages 68 and 69 he testified as follows:
"`Q. Now the amount of money you paid Mr. McMullin for cutting this timber down, for peeling and for hauling it to the railroad line in trucks, was actually for labor that Mr. McMullin and his men had put in on that job, isn't that true, sir? A. I just paid him for the poles, sir.
"`Q. Why? A. For bringing them and delivering them and loading them in the car.
"`Q. And cutting them too, sir, didn't you? A. Well, they had to be cut.
"`Q. That was included too, wasn't it? A. Sir?
"`Q. That was included too, wasn't it? A. Well, they had to be cut.'
"Finally, at page 70, the Court becoming disgusted at the witness's flagrant attempts to evade the direct answer to every question, the answer to which might tend to prove that Conroe owned the timber and McMullin was contracted with to log it, told the examiner that the Court believed the examination along that line had gone far enough. If there had remained any doubt in the Court's mind, after Mr. Anderson testified, that Vaughn bought timber *278 for Conroe and contracted with McMullin to cut and haul it, that doubt would have been dispelled by the obvious attempts of Vaughn to evade answering questions, if not worse than evaded. Throughout his testimony, Vaughn attempted to make it appear that he `bought' the poles from McMullin, delivered on the cars and that his so-called `advances' to Anderson for the timber were made for McMullin. However, admittedly, McMullin knew nothing of Vaughn's arrangement with Anderson, how much he, Vaughn, was paying Anderson for the timber, and, in fact, nothing whatever of Vaughn's deal with Anderson. The only thing McMullin knew about the transaction, as far as he was concerned, was that he was to cut, peel, haul and load certain of the timber onto the railroad cars, for which Vaughn would pay him a certain specified amount per pole.
"In the Court's opinion, Vaughn's transaction with Anderson had all of the elements of a sale, namely, the thing, the price and consent. [LSA] CC 2439. Since Conroe owned the timber, having bought it from Anderson, it could not have thereafter bought the same timber from McMullin. [LSA] CC 2443. The sale is perfect between the parties, and the property is of right acquired by the purchaser, as soon as the agreement of sale is perfected. [LSA] CC 2456.
"The provisions of the Compensation Statute applying to the facts, as to the relationship, and the result of that relationship, as existing between Conroe and McMullin, are to be found in Section 6 of the Act, now [LSA] R.S. 23:1061, which reads as follows:
"`Where any person (in this section referred to as principal) undertakes to execute any work, which is a part of his trade, business or occupation or which he had contracted, to perform, and contracts with any person (in this section referred to as contractor) for the execution by or under the contractor of the whole or any part of the work undertaken by the principal, the principal shall be liable to pay to any employee employed in the execution of the work or to his dependent, any compensation under this chapter which he would have been liable to pay if the employee had been immediately employed by him; and where compensation is claimed from, or proceedings are taken against, the principal, then, in the application of this chapter reference to the principal shall be substituted for reference to the employer, except that the amount of compensation shall be calculated with reference to the earnings of the employee under the employer by whom he is immediately employed.
"`Where the principal is liable to pay compensation under this Section, he shall be entitled to indemnity from any person who independently of this Section would have been liable to pay compensation to the employee or his dependent, and shall have a cause of action therefor.'
"Applying the quoted provisions of this Statute to the facts of this case, and in view of the jurisprudence of the State on the subject, the Court has not the slightest doubt that McMullin was Conroe's independent contractor and that Conroe is liable for compensation to the employee of McMullin, for injuries received while in his employment in the doing of the work he contracted to do.
"Counsel for Conroe cites many cases in which the Court has denied compensation on the ground that a buyer and seller relationship existed between the employer and the one who acquired the timber, but the facts of those cases clearly make them inapposite here. In each of those cases the alleged principal actually bought the product delivered at the mill, plant or cars. It did not, itself, own the timber, as in this case. The analogy of each of the cases would serve only to lengthen this opinion unreasonably.
"The purpose of the Statute making the principal liable for workmen's compensation to the employees of a contractor injured *279 while engaged in the principal's trade or business is to prevent evasion of compensation by employer engaged in hazardous work, when the hazardous work let by contract is part of the regular business of the principal. Williams v. Consumers Ice Co. [La.App.] 68 So.2d 246; Malone's Louisiana Compensation Law and Practice, Sections 121, 122, 124, 125 and 126.
"As this Court sees this case, particularly from the viewpoint of Vaughn's testimony, it presents a clear cut attempt on the part of Conroe to evade the payment of compensation to employees who may be injured while engaged in the work of cutting and hauling its piling and poles.
"It appears, too, that by testifying that Conroe nowhere engages in the work of cutting, peeling, hauling and loading these products onto the cars, and only buys them when loaded, Vaughn hoped to make it appear that Conroe was not engaged in that hazardous business, and thus to remove its liability from under our compensation law. It could as well be argued that cutting and hauling logs is not a part of the trade or business of a saw mill, where it, by its own direct employees, does not produce, that is cut and haul the logs to the mill, but by such device as Vaughn would have the Court approve in this case, obtain the logs delivered at its mill, even though it actually had bought the standing tree. Such, of course, is not the law, as is shown by the jurisprudence of this State.
"The jurisprudence is replete with statements that the Courts will be alert to detect the use of the resale device as a means of avoiding compensation liability, by interposing an impecunious middleman between liability and the real owner or principal, whenever the middleman is in fact an employee, partner or a contractor acting for the defendant. Hatch v. Industrial Lumber Co. [La.App.], 199 So. 587; Perkins v. Hillyer Deutsch Edwards, Inc., La.App., 199 So. 590; Reed v. J. W. Jeffries Lumber Co. [La.App.], 9 So.2d 87. And such a sale will in effect be branded as a subterfuge. Carter v. Colfax Lumber & Creosoting Co. [9 La.App. 497], 121 So. 233. The facts of the last cited (Carter) case are almost on all-fours with the facts of the instant case, and the defendant was held liable under Section 6 of the Act. Also Belaire v. Elder [La.App.], 49 So.2d 508, when it was held:
"`Where lumber company operated sawmills of its own, and employed an independent contractor to cut timber and deliver it to lumber company in a rough state, and lumber company thereafter dressed timber and sold it to retail outlets, independent contractor was employed to do work which was part of the "business, trade or occupation" of lumber company, so as to place employee of independent contractor under provisions of Workmen's Compensation Act as an employee of lumber company. Act No. 20 of 1914, 6, subd. 1, as amended by Act No. 85 of 1926, § 1.'
See also Horrell v. Gulf & Valley Cotton Oil Co. [15 La.App. 603], 131 So. 709; Thibodaux v. Sun Oil Co., 218 La. 453, 49 So. 2d [852] 854.
"An able and enlightening Article on the principal's liability for workmen's compensation to employees of contractors and an analysis of the circumstances and facts in which such liability has been imposed, written by that imminent author, Professor Malone, is to be found in 10 La.L.R. at page 25. In that Article all of the cases up to the time of its publication, 1949, are discussed and analyzed. In the light of these cases and Mr. Malone's analysis of each opinion and the facts upon which it is based, it cannot be doubted that, under the facts of the present case, the buyer and seller relationship did not exist between McMullin and Conroe, but that McMullin was undoubtedly Conroe's independent contractor. This being true and it being also true that the operation of cutting and hauling the tree, or log, as a necessary precedent to its being treated with creosote, just as the same operation is a necessary precedent, in the sawmill business, of sawing the log into lumber, *280 constitutes part of Conroe's operations, and it being true that plaintiff was injured while working for Conroe's independent contractor, in such operation, it follows that Conroe must be held liable to this plaintiff under the provisions of Section 6 of the Act, [LSA] R.S. 23:1061."
The remaining question concerns the liability of the Century Indemnity Company. This was answered by the Trial Judge as follows:
"This brings us to a discussion of the question of liability of Century, Conroe's compensation insurance carrier.
"Attached to the petition and filed in evidence by the plaintiff (Tr. 46) and marked `P-1' is an insurance policy issued by Century to Conroe.
"It is Century's contention that its liability is restricted to the coverage set out under the terms of the contract of insurance and that under those terms there is no coverage other than of its employees in Texas.
"That the policy is a Texas contract, executed at Houston, Texas, seems certain. The first page of the exhibit (P-1) is headed: `Application for Texas Standard Workmen's Compensation and Employers Liability Policy.' (Emphasis added.)
"Under Item three it appears that the location of all factories, or other work places of the insured is at Butlerburg switch 3 miles East of Conroe, Texas, and elsewhere in Texas.
"Counsel for plaintiff contend, in their brief, that under the following quoted provisions of the policy, Century is liable to this employee:
"The Century Indemnity Company, Hartford, Conn. (Herein called the Company)
"`Does hereby agree with this Employer, named and described as such in the Declarations forming a part hereof, as respects personal injuries sustained by employees including death at any time resulting therefrom as follows:
"`One (a) To Pay Promptly to any person entitled thereto, under the Workmen's Compensation Law and in the manner therein provided, the entire amount of any sum due, and all installments thereof as they become due,
"`(1) To such person because of the obligation for compensation for any such injury imposed upon or accepted by this Employer under such of certain statutes, as may be applicable thereto, cited and described in an endorsement attached to this Policy, each of which statutes is herein referred to as the Workmen's Compensation Law, and
"`(2) For the benefit of such person the proper cost of whatever medical, surgical, nurse or hospital services, medical or surgical apparatus or appliances and medicines, or, in the event of fatal injury, whatever funeral expenses are required by the provisions of such Workmen's Compensation Law. It is agreed that all of the provisions of each Workmen's Compensation Law covered hereby shall be and remain a part of this contract as fully and completely as if written herein, so far as they apply to compensation or other benefits for any personal injury or death covered by this Policy, while this Policy shall remain in force. Nothing herein contained shall operate to so extend this Policy as to include within its terms any Workmen's Compensation Law, scheme or plan not cited in an endorsement hereto attached.
"`One (b) To Indemnify this Employer against loss by reason of the liability imposed upon him by law for damages on account of such injuries to such of said employees as are legally employed wherever such injuries may be sustained, within the territorial limits of the United States of America or the Dominion of Canada. In the event of the bankruptcy or insolvency of this Employer the Company shall not be relieved from the payment of such indemnity *281 hereunder as would have been payable but for such bankruptcy or insolvency. If, because of such bankruptcy or insolvency, an execution against this Employer is returned unsatisfied in an action brought by the injured, or by another person claiming by, through or under the injured, then an action may be maintained by the injured, or by such other person claiming by, through or under the injured, against the Company under the terms of this Policy for the amount of the judgment in said action not exceeding the amount of this Policy.
"`Two: To serve this Employer (a) by the inspection of work places covered by the policy when and as deemed desirable by the Company and thereupon to suggest to this Employer such changes or improvements as may operate to reduce the number of severity of injuries during the work, and, (b) upon notice of such injuries, by investigation thereof and by settlement of any resulting claims in accordance with law.
"`Three: To Defend, in the name and on behalf of this employer, any suits or other proceedings which may at any time be instituted against him on account of such injuries, including suits or other proceedings alleging such injuries and demanding damages or compensation therefor, although such suits, other proceedings, allegations or demands are wholly groundless, false or fraudulent.
"`Four: To Pay all costs taxed against this Employer in any legal proceeding defended by the Company, all interests accruing after entry of judgment and all expenses incurred by the Company for investigation, negotiation or defense.
"`Five: This Agreement shall apply to such injuries sustained by any person or persons employed by this Employer whose entire remuneration shall be included in the total actual remuneration for which provision is hereinafter made, upon which remuneration the premium for this Policy is to be computed and adjusted, and, also to such injuries so sustained by the President, any Vice-President, Secretary or Treasurer of this Employer, if a corporation. The remuneration of any such designated officer shall not be subjected to a premium charge unless he is actually performing such duties as are ordinarily undertaken by a superintendent, foreman or workman.
"`Six: This Agreement shall apply to such injuries so sustained by reason of the business operations described in said Declarations which, for the purpose of this insurance shall include all operations necessary, incident or appurtenant thereto, or connected therewith, whether such operations are conducted at the work places defined and described in said Declarations or elsewhere in connection with or in relation to, such work places.' (Emphasis added.)
"This Court does not agree with Counsel's interpretations of these quoted provisions of the policy, for the reason that the agreement to indemnify the insured for injuries to its employees, refers, in each instance, or means insured's employees in Texas. Counsel particularly urge that that part of paragraph numbered six and quoted above, reading `Whether such operations are conducted at the work places defined and described in said declarations or elsewhere in connection with, or in relation to, such work places,' were designed to and do cover such a situation as we have in this case. The Court believes that that provision would have to be said to be modified by the provisions of the declaration that the policy covered only Texas employees.
"The Court of Appeal, Second Circuit, in Johnson v. El Dorado Creosoting Co., 71 So.2d 613, decided that a very similar policy, written in Arkansas, did not cover a Louisiana employee, although in that case, it appears that the contract of employment was actually an Arkansas Contract.
"There is another reason, which the Court believes to be unanswerable, why this policy of insurance does not cover plaintiff's injuries and that reason is this: It must be conceded that, in the absence of *282 Section 6 of the Louisiana Compensation Statute ([LSA] R.S. 23:1061) the principal (Conroe in this case) would not be liable for compensation for injuries to employees of its contractor (McMullin in this case). Whether the Texas Compensation law has the same or a similar provision the Court does not know, since the Texas Statute was not offered in evidence and the Court cannot take notice of the Statutes of another state in the absence of proof of that law. It follows, therefore, that since plaintiff was not directly employed by Conroe, but by the Contractor, McMullin, and only Conroe's employees are covered by this insurance contract, that contract does not cover plaintiff's injuries, sustained while in the contractor's employ. Even if the policy had been a Louisiana contract, it would not have covered plaintiff's injuries, except for the provisions of Section 6 of the Act.
"It follows, therefore, that the exception of no right of action filed by Century must be maintained and plaintiff's demands, as to that defendant must be rejected. For the reasons assigned, the exception of no right of action filed by Conroe is overruled."
Now with reference to the exception of jurisdiction ratione personae which was filed on behalf of defendant Conroe Creosoting Company and which the Lower Court overruled upon written reasons, we quote part of same as follows:
"Upon the filing of the petition, citation was issued, addressed to Conroe, the Sheriff's returns upon which showed that no service could be made because no officer, agent or employee of defendant could be found in the State. It was then ordered that service be made on the Secretary of State, under the provisions of [LSA] R.S. 13:3471, subdivision 5(d).
"The defendant, Conroe, excepted to the Court's jurisdiction, ratione personae, on the ground, as set out in the exception, that it is a citizen and resident of and domiciled in the State of Texas and conducts no operations in Louisiana that could be considered as doing business in this State. It is this exception that is now before the Court for decision, it having been submitted on oral arguments supplemented by briefs, the last of which the Court received on October 31, 1955.
"The facts, as stipulated on the trial of the exception, are as follows:
"Prior to March 22, 1954, Conroe purchased a tract of timber in Vernon Parish, and engaged McMullin as an independent contractor to cut and deliver it to a point on the railroad in that Parish. Conroe inspected the timber after it was cut and peeled by an agent in the Parish, and the poles were then shipped to Conroe's plant in Texas; that Conroe had no plant or equipment in Vernon Parish, nor to the knowledge of the parties, in the State of Louisiana; that Conroe is a Texas Corporation, domiciled at Conroe, in said State.
"The stipulated facts were supplemented by the testimony of the plaintiff, as follows:
"He was injured while working on the job on March 22, 1954; a Mr. Vaughn, an employee of Conroe inspected and `took-up' the logs for Conroe; plaintiff was paid by McMullin, who owned the equipment and Conroe had none, so far as plaintiff knew; they worked on the job about three weeks; Conroe paid the severance tax; Conroe bought the timber and contracted with McMullin to cut it and haul it for Conroe.
"While the briefs filed by able counsel on both sides go, at length, into an enlightening discussion of jurisprudence as to what constitutes due process, as regards the service of process upon nonresidents and the obtaining of personal judgments against them under substituted services, the question to be decided by the Court is `has the Defendant Conroe, engaged in business activities in the State through acts performed by its employees or agents in this State,' within the meaning of that phrase, as it is used in subdivision 5(d) of *283 [LSA] R.S. 13:3471 which, for convenience, in reference, is quoted as follows:
"`(d) If the corporation is not one required by law to appoint an agent for service of process but has engaged in business activities in this state through acts performed by its employees or agents in this state, service of process in any proceeding on a cause of action resulting from or relating to such acts performed in this State or any taxes or other obligations arising therefrom may be made on any employee or agent of the corporation, over eighteen years old, found in this state, or in the event such employees or agents are no longer in this state or cannot be found, the officer charged with the duty of making the service, after diligent effort, shall make return to the court, stating the efforts made by him to secure service, and the reasons for his failure so to do, and thereafter, the judge, or in the event of his absence from the parish, the clerk, shall order service to be made on the Secretary of State, whose duty it shall be forthwith to ascertain the domiciliary post office address and send, by registered mail with return receipt requested, addressed to the corporation at said address, the originals of the papers served upon him, retaining in his office true copies thereof, upon which he shall note the date, the manner and other particulars of the service, and of the disposition of the originals.'
"Exceptor's counsel strongly relied, in his oral argument, and, perhaps, to a lesser extent in his brief, on the case of Johnson v. El Dorado Creosoting Co., decided by the Court of Appeal, Second Circuit, in 1954, the cause having arisen in 1951, and reported in 71 So.2d 613. We agree with counsel that that case is, in some respects, similar to the one here under consideration, but we believe is easily distinguishable from this case. In the Johnson case, the defendant owned timber in Louisiana, and through independent contractors logged it into Arkansas. Both Johnson and the defendant were citizens of Arkansas, where the contract was entered into. The Court, in that case, seemed to base its opinion, largely, on the extent, or lack of extent, of the business the defendant transacted in this State. The Court of Appeal, in the Johnson case, evidently did not have called to its attention, since it made no mention thereof in its opinion, the fact that the purpose of Act 21 of 1950, amending [LSA] R.S. 13:3471, was to permit Louisiana to capitalize on the full potential of International Shoe Co. v. State of Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95, 161 A.L.R. 1057, and permit the Courts of this State to entertain jurisdiction in suits against foreign corporations actually doing some business in the state, even though such business would not have subjected the corporation to the taxing power of the State, or forced it to apply for a license here, as pointed out by Dr. McMahon in his comments under [LSA] R.S. 13:3235, Vol. 7, Page 11. And perhaps, it was because of the Court's failure to take notice of the amendment, that the Supreme Court granted writs in the Johnson case.
"Under subdivision 5(d) of [LSA] R.S. 13:3471, as the provisions of that section are now written, where the foreign corporation is one not required to appoint an agent for service of process, but has engaged in business activities in the State, through acts performed by its employees or agents in the State, service in `any cause of action resulting from or relating to such acts performed in this State * * * or other obligation arising therefrom' may be made on the Secretary of State, where no employee or agent may be found upon whom service can be made.
"It is not denied, and it cannot be, that plaintiff has alleged a cause of action as against Conroe. How did that cause of action arise? The answer must be, out of acts performed in this State by Conroe's independent contractor, McMullin, who the record shows to be a resident of this State, the contract being a Louisiana *284 contract, admittedly made by Conroe, necessarily through its agent, since a corporation being a ficticious being, may act only through some human agency.
"When Conroe, through its agent, came into the State and contracted with McMullin, as an independent contractor, to execute the work of cutting and hauling the timber, it was charged in law with knowledge that if an employee of McMullin's should be injured in doing the work, it, Conroe, would be liable under Section 6 of the Compensation Act as amended, and as now appears as [LSA] R.S. 23:1061, page 376 of Vol. 16, L.S.A. Therefore, the obligation imposed by that Section arose out of business activities performed by the agents or employees of Conroe in this State, when plaintiff received accidental personal injuries while in the employ of the independent contractor in the performance of the hazardous work he contracted to perform for Conroe.
"It is hardly necessary to discuss the constitutionality of [LSA] R.S. 13:3471, particularly since that question is not directly raised. Suffice it to say that the Statute, providing for such substituted service may said to be analogous to [LSA] R.S. 13:3474, the automobile accident service Statute. The principle upon which the Courts have repeatedly held that such substituted service does not violate the due process clause of the Federal Constitution, is that foreigners who come into the State and engage in activities in the State, and receive the benefit and protection of its laws (in this case, the compensation law particularly) subject themselves to the jurisdiction of its courts to determine causes of action arising out of such activities and consent to its statutes designating an official (Secretary of State) upon whom service of process may be had."
In support of its exception to the jurisdiction, defendant, Conroe, lays great stress on the case of Johnson v. El Dorado Creosoting Co., supra, but it is our information and understanding of the case that the Court of Appeal, Second Circuit, reversed the judgment of the Lower Court and that reversal was based on the volume or lack of volume of business done in the state by the foreign corporation. In doing this the Court of Appeal apparently disregarded the clear verbiage and provisions of Section 5(d), LSA-R.S. 13:3471 and held that the amount of business done by the foreign corporation was the determining factor. Be that as it may nevertheless, the Supreme Court of Louisiana granted a writ of certiorari in order to examine the correctness of this Court of Appeal judgment. It is apparent that the Supreme Court questioned the correctness of the judgment of the Court of Appeal or the writ would not have been granted. It is our understanding and appreciation that this particular case was compromised and will never be passed upon by the Supreme Court. If a non-resident motorist by the operation of a motor vehicle on the highways of our state shall be deemed equivalent to an appointment by such non-resident of the Secretary of the State of Louisiana as his true and lawful attorney for the service of process under LSA-R.S. 13:3474, we are likewise of the opinion in view of Section 5(d), LSA-R.S. 13:3471, that when a non-resident or foreign corporation comes into the state and buys a large tract of timber and engages a contractor to cut, peel and haul said timber to the railroad for shipment to the domicile of the foreign corporation, that the foreign corporation is engaged in business activities in this state through its agents and should be amenable to our jurisdiction particularly as a defendant in a workmen's compensation claim under LSA-R.S. 23:1061. If we followed defendant's contention and theory in this case, it would just be another mode whereby a foreign corporation could come into the State of Louisiana and do business through an impecunious agent and possibly avoid liability. We are therefore of the opinion that the exception was properly overruled.
*285 All of the above quoted findings of fact are amply supported by the record and are also correct legally. Finding no manifest error in the judgment appealed from, the same is hereby affirmed.
Judgment affirmed.